Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 97 C 5507 | **DATE** | 8/31/2000 |
| **CASE TITLE** | Lorann Urban vs. Blossom Hill Health Centre, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☒ Status hearing[held/continued to] [set for/re-set for] on xxx set for 9/11 at 9:00.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 115-1) is granted in part and denied in part. Defendant's motion to strike (Doc. No. 130-2) and to deem certain facts admitted (Doc. No. 130-1) is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 01 2000 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING 00 AUG 32 AM 8:02 | docketing deputy initials | 136 |
| | Copy to judge/magistrate judge. | | 8/31/2000 | |
| ETV | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LORANN URBAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 97 C 5507 |
| | ) | |
| BLOSSOM HILL HEALTH CENTRE, | ) | Judge Rebecca R. Pallmeyer |
| INC., an Illinois corporation, ROBERT | ) | |
| JAFARI, and KIANOOSH JAFARI, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
SEP 0 1 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff Lorann Urban ("Plaintiff") filed this suit against her previous employer, Defendant Blossom Hill Health Centre, Inc. ("Blossom Hill") alleging both hostile environment and *quid pro quo* sexual harassment, and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. Specifically, Plaintiff alleges that after she terminated a consensual relationship with Robert Jafari ("Jafari"), Blossom Hill's Administrator, Jafari began to subject her to unwelcome sexual advances, comments, and touching, thereby creating a hostile work environment. Plaintiff also alleges that she suffered tangible job consequences as a result of rebuffing the advances. Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that Jafari's conduct was nothing more than "merely vulgar and mildly offensive," and that Plaintiff has offered no evidence that she was treated less favorably than similarly situated males. For the reasons set forth below, the motion is denied in part and granted in part.

# FACTUAL BACKGROUND[1]

### A.  Blossom Hill

Blossom Hill is an Illinois corporation that operated a nursing home facility from June 1996 through May 1998.[2] (Def.'s Rule 56.1(a)(3) Statement Of Material Facts In Support Of Its Motion For Summary Judgment [hereinafter "Def.'s 56.1 Statement"] ¶ 2.) Dr. Kianoosh Jafari ("Dr. Jafari") and his son, Robert Jafari, are the sole stockholders of Blossom Hill, and also serve on its Board of Directors. (*Id.*) Jafari, who was twenty-five years old at the time Blossom Hill began operating, served as its Executive Director and Administrator, overseeing the daily operations, assisting the department managers and improving the physical plant of the nursing home. (*Id.* ¶¶ 6-8.) After an interview with Jafari, Plaintiff accepted and assumed the position of Executive Assistant to the Administrator. (*Id.* ¶ 11, 13.) She worked at Blossom Hill from July 1996 through August 1997. (Urban Dep., at 70-1, 395.) According to Plaintiff, her job as Executive Assistant consisted of performing miscellaneous

---

[1]     Defendant has moved to strike (Doc. No. 130-2) certain paragraphs of Plaintiff's 56.1 Factual Statement on hearsay and relevancy grounds and has moved to deem admitted (Doc. No. 130-1) other paragraphs of Plaintiff's Statement as unsupported by the record. The court provisionally denies both motions, but notes that to the extent Plaintiff's factual assertions are irrelevant or inadmissible as hearsay, they are not included in this decision. The court further notes that to the extent the court has found support for Plaintiff's factual assertions based on an independent review of the record, those facts will be included in this decision.

[2]     Although it is not entirely clear from the record, it appears that Blossom Hill no longer operates a nursing home. At some unspecified time, the Health Care Financing Administration terminated Blossom Hill's Medicare and Medicaid funding after having determined that the conditions there constituted immediate jeopardy to the health and safety of the residents. (Plaintiff's Local Rule 56.1(b)(3) Response And Counterstatement To Defendant's Local Rule 56.1(a)(3) Statement of Material Facts ¶ 253.)

administrative projects assigned by Jafari. (*Id.* at 71.)

## B.     The Consensual Relationship

Plaintiff and Jafari began to socialize outside of work in August of 1996. (Def.'s 56.1 Statement ¶ 18.) The parties dispute when they entered into an intimate relationship. Plaintiff admits that in late August 1996, she reluctantly had sexual intercourse with Jafari.[3] Despite admitting to having engaged in sexual intercourse with Jafari in August, Plaintiff claims that the consensual relationship began in mid-September 1996, around the same time Plaintiff stopped living with her husband. (Urban Dep., at 54; Def.'s 56.1 Statement ¶ 22.) Plaintiff acknowledges that at this time, Jafari gave her $1,000 for her security deposit on an apartment. (Urban Dep., at 407.) It is undisputed that during the course of their relationship, Plaintiff and Jafari frequently saw each other socially and engaged in a consensual sexual relationship.

The parties disagree on the length and intensity of the relationship. Plaintiff alleges that she had a consensual relationship with Jafari for approximately two weeks, although she concedes that she gave him the impression she "wanted to be with him" for "maybe four weeks." (Pl.'s Local Rule 56.1(b)(3) Response And Counterstatement To Defendant's Local

---

[3]     Plaintiff has submitted evidence that a social worker, Ms. Lyda Shamblin, characterized Plaintiff's first sexual encounter with Jafari as "date rape." (Pl.'s Local Rule 56.1(b)(3) Response And Counterstatement To Defendant's Local Rule 56.1(a)(3) Statement of Material Facts ¶ 21.) According to Plaintiff, during this initial sexual encounter, "no matter how many times [she] told Robert Jafari to stop, he kept it up, and at some point she gave in[.]" (*Id.*) Notably, however, Plaintiff does not include this incident in her sexual harassment or sexual discrimination charges against Blossom Hill.

Rule 56.1(a)(3) Statement of Material Facts [hereinafter "Pl.'s 56.1 Statement"] ¶ 23; Urban Dep., at 54, 372.)   During this time, Plaintiff asserts that she frequently expressed her objections to dating Jafari, and even told him that she "had no interest in him." (Pl.'s 56.1 Statement ¶¶ 21, 23.)  According to Plaintiff, she occasionally expressed to Jafari her concerns about retaining her job if the relationship did not work out. (Urban Dep., at 228.)  Plaintiff testified that in response, Jafari told her "all the time" that no matter what happened with their relationship, her job was never in jeopardy. (*Id.*)  Indeed, Plaintiff asserts that Jafari told her that although he had made his past secretary quit so they could remain dating, he would not force Plaintiff to quit if their relationship ended.[4] (Pl.'s 56.1 Statement ¶ 146.)

Defendant, on the other hand, asserts that the relationship continued beyond just two weeks. In October or November 1996, Jafari moved to Wisconsin to continue his education. (Def.'s 56.1 Statement ¶¶ 31, 34.) Jafari testified that he often told Plaintiff that he loved her, and also told her that he wanted to marry her. (Jafari Dep., at 102-03, 127.)  Plaintiff responded that she did not want to leave her family. (Pl.'s 56.1 Statement ¶ 33.) According to Jafari, he and Plaintiff mutually agreed to end the relationship sometime in November, after Jafari moved to Wisconsin. (Def.'s 56.1 Statement ¶ 36, Jafari Dep., at 149-50.)

---

[4]      Defendant moves to strike this paragraph as evidence restricted by a protective order entered by this court.  On May 18, 1999 the court granted Defendant's motion for a protective order restricting testimony about Jafari's childhood or adolescent experience.  In the court's view, however, this fact on its face does not fall within the scope of the protective order.

**C.    The Post Consensual Relationship:  October 1996 Through December 1996**

Disputing Jafari's version of events, Plaintiff alleges that the relationship ended sometime around the beginning of October. (Urban Dep., at 54.) Following the end of their relationship, in October and November 1996, Plaintiff claims that Jafari frequently made inappropriate comments of a sexual nature to her, including referring to her as a dog "in a sexual way," and telling her he "wanted to touch [her] tuna taco." (*Id.* at 561-62.) Plaintiff also claims that at this time Jafari touched her against her will "all the time" from the beginning of October through mid-November. (*Id.* at 491.) Specifically, she alleges that Jafari repeatedly placed his hands on her buttocks and grabbed her around the waist. (*Id.* at 490-91, 497.) On one occasion, Julie Gralewski, the woman with whom Plaintiff shared an office at Blossom Hill, witnessed Jafari grab Plaintiff by the waist and pull her on to his lap. (Gralewski Dep., 111-113.) Plaintiff alleges that on another occasion, Jafari took off his shoe and ran his foot up and down her leg during a staff meeting. (Urban Dep., at 497.)  Also during this time period, Kathy Miller, a nurse at Blossom Hill, testified that she witnessed an incident in which Jafari "grabbed [Plaintiff's] rear end." (Miller Dep., at 7.)  Miller testified that Plaintiff moved away from Jafari and gave him a "dirty look," to which he responded with a laugh. (*Id.*)

During this time Jafari continued to ask Plaintiff to socialize with him.  Although Defendant denies that Jafari ever made such a statement, Gralewski testified that on at least one occasion, she overheard Jafari ask Plaintiff "whether or not she was going to come to

5

work tomorrow." after Plaintiff declined his request to go out.[5] (Gralewski Dep., at 69.)
Despite this alleged threat, Plaintiff suffered no immediate consequence at work.
(Defendant's Rule 56.1 (a) (3) (B) Reply to Plaintiff's Counterstatement of Material Facts
¶ 149). On other occasions, allegedly after Plaintiff had ended the relationship, Plaintiff did
accept Jafari's invitations to socialize.  For example, Plaintiff and Jafari traveled together
several times during this post-consensual period.  Specifically, the two went to Chicago for
the weekend twice in October of 1996. (Def.'s 56.1 Statement ¶¶ 25-26.) During the second
trip to Chicago, Plaintiff's two children accompanied the pair. (Id. ¶ 26.) After Jafari decided
to move to Wisconsin, he and Plaintiff spent a weekend there in late October or early
November. (Id. ¶ 33.)  Plaintiff asserts that she accepted these invitations because she "gave
up telling him no," and "couldn't afford to lose [her] job." (Urban Dep., at 58, 66.)

        In mid-November, Plaintiff returned to Wisconsin for a week with Jafari and her two
children. (Def.'s 56.1 Statement ¶ 34.)  Plaintiff claims that she accompanied Jafari on this
occasion to help him "set up a residence." (Pl.'s 56.1 Statement ¶ 34.)  Because Plaintiff had
not earned vacation time yet, Jafari reimbursed her the amount of her usual work wage for
the time she spent with him in Wisconsin.  According to Plaintiff, Jafari told her repeatedly
at this time that she was going to move to Wisconsin with him, despite her insistence that she

---

[5]        While Gralewski only describes in detail this particular threat, she testifies that
Jafari "constantly" made such threats to Plaintiff. (Gralewski Dep., at 67.)  Defendant has
moved to strike these comments as hearsay; but a threat is not, strictly, a statement of fact
offered for its truth.  Oddly there is no mention of this threat in the Plaintiff's deposition,
although Plaintiff did testify that she often accepted Jafari's invitations because she "couldn't
afford to lose her job." (Urban Dep., at 58.)

did not want to move. (Urban Dep., at 67.)  On the way back from the this trip, Plaintiff

claims that she told Jafari that they "were not right for each other and that things were not

working out." (*Id.* at 210.)  Shortly thereafter, Jafari moved to Wisconsin and left his job at

Blossom Hill.

One or two weeks after this second trip to Wisconsin, Plaintiff alleges that Jafari

appeared at her apartment unexpectedly. (*Id.* at 211.)  Plaintiff invited him in, they spoke for

a few minutes, and he left at her request. (*Id.* at 212-14.)  Plaintiff also testified that she and

Jafari went shopping sometime after Thanksgiving, and that at that time, Jafari bought her

children Christmas gifts. (*Id.* at 215-16.)  In mid-December Plaintiff decided to write a letter

to Jafari because she "wanted to get through to him . . . that [she] . . . didn't want anything

to do with him without upsetting him." (*Id.* at 216.)  In her December 12, 1996 letter

Plaintiff wrote, "I know I said we could see each other when you were in town, but I don't

think I want to." (Letter from Urban to Jafari 12/12/96, Ex. 16 to Plaintiff Dep.)  She

further wrote:

> You can call me if you want sometimes, but I don't think I want to see you.
> I don't see the point in pursuing a relationship with someone who I have
> absolutely no future with. I can't see me spending the rest of my life with you,
> and like you said, it's better to end it now then [*sic*] to drag it out.

(*Id.*)

## D.    Plaintiff Continues Her Employment At Blossom Hill

After Jafari's departure from Blossom Hill, Plaintiff continued to serve as Executive

Assistant, taking assignments from Dr. Jafari, James Yuill, the new Administrator, and

occasionally taking assignments from Robert Jafari over the phone. (Def.'s 56.1 Statement ¶ 40.) From mid-December of 1996 to March of 1997, Jafari and Plaintiff had no contact. (Urban Dep., at 33-4.) During her time at Blossom Hill, Plaintiff engaged in a conversation with a female coworker in which she told her that her new boyfriend was well-endowed with a large penis. (*Id.* at 399-400.) Also during her time at Blossom Hill, a male co-worker stated that he had a "toe fetish" and asked to put Plaintiff's toes in his mouth. (*Id.* at 400.) In front of a group of co-workers, Plaintiff extended her foot, not believing he would actually put her foot in his mouth. (*Id.* at 401) When the co-worker did put her toe in his mouth, Plaintiff pulled back her foot and the group laughed. (*Id.*)

### E.     The Post-Consensual Relationship: March 1997 Through July 1997

In late March of 1997 Jafari returned to work at Blossom Hill, resuming full-time duties by May of that year. (Def.'s 56.1 Statement ¶ 46.) The first contact that Plaintiff had with Jafari upon his return was in late March. Plaintiff alleges that Jafari stood outside her office door and asked in a loud voice if she wanted to make $500 dollars, and then entered her office and closed the door. (Urban Dep., at 240-41.) Once inside her office, Plaintiff claims that Jafari then explained that he wanted to sell his snow plow and needed a place to store it, for which he was willing to pay half the sale price. (*Id.* at 241.) Plaintiff testified that Jafari's remarks and the way in which he closed the door embarrassed her in front of her co-workers. (*Id.* at 242.) She alleges that he deliberately made it look as if she were performing sexual favors for money, and that as a result, Plaintiff became the subject of jokes with co-workers. (*Id.* at 241-42.)   During this same conversation, Jafari allegedly asked Plaintiff to lunch.

Plaintiff declined the invitation, and Jafari never asked her again.  (*Id.* at 294.)

According to Plaintiff, Jafari frequently asked her questions about her private life, including who she was dating and about her divorce.  (*Id.* at 244-46.)  She also claims that Jafari often stood uncomfortably close to her, "stand[ing] over [her] shoulder," although she acknowledges that he never touched her.  (*Id.* at 302, 563.)  Further, Plaintiff alleges that Jafari came to her office and stared at her for long periods of time without saying anything.  (*Id.* at 299-300)  According to Plaintiff, he repeatedly stared for a few minutes at a time from the end of March to the beginning of May 1997.  (*Id.* at 299.)  On one occasion, Plaintiff alleges that Jafari stared at her for the duration of an entire meeting.  (*Id.* at 303.)  Plaintiff claims that she even moved to another chair to avoid Jafari's gaze, and that he followed so he could continue to watch her.  (*Id.*)  Defendant disputes Plaintiff's version of events, contending that Jafari never stared at Plaintiff.  (Def.'s 56.1 Statement ¶ 70.)

F.    **Plaintiff's Discipline and Transfer**

Plaintiff admits becoming short tempered with Jafari from the period of late March to early May, claiming that she was tired of his questions about her personal life and his staring.  (Urban Dep., at 288-89.)  Although she contends that she tried to remain professional, Plaintiff acknowledges that her behavior probably bordered on rudeness.  (*Id.* at 289.)  In late May or early June of 1997, Jafari and Jennifer Steichen, Blossom Hill's Human Resources Director, approached Plaintiff and verbally warned her about her "attitude."  (Written Documentation of Verbal Warning for Lori Urban, Ex. 18 to Urban's Dep; Urban Dep., at 295.)  According to Plaintiff, Jafari told her that if she did not talk to

him in a professional manner that she would not have a job in four weeks.  (Urban Dep., at
295.)  At this time Plaintiff told Jafari that she "had an attitude" because he asked her personal
questions and came to her office and stared at her.  (*Id.* at 252.)  After this conversation, the
staring allegedly stopped.  (*Id.* at 300.)

On June 6, 1997, Plaintiff received an "above-average" to "outstanding" performance
evaluation.  (Urban Dep., Ex. 17.)  In the space for comments, Jafari wrote "she can improve
on her friendliness towards the people she works with."  (*Id.*)  Later that month, Plaintiff's
co-workers began complaining about her uncooperative attitude.  (Urban Dep., at 255.)
Urban had also been failing to complete work assignments.  (Employee Warning/Discipline,
Ex. 19 to Urban Dep.)  As a result, Jafari issued the Plaintiff a written reprimand on June 24,
1997.  (*Id.*)  On July 7, 1997 Plaintiff was suspended with pay for two days for failing to
complete her work.  (Employee/Discipline, Ex. 20 to Urban Dep.)

On July 1, 1997, Plaintiff filed a Charge of Discrimination for sexual harassment with
the Illinois Department of Human Rights based on Jafari's alleged conduct after returning
from Wisconsin.  (Def.'s 56.1 Statement, Ex. 1.)  Shortly thereafter, on July 14, Blossom Hill
transferred Plaintiff from the position of Executive Assistant to Ward Clerk.  Defendant
claims that pursuant to conversations its counsel had with Plaintiff's counsel, it transferred
Plaintiff in order to minimize contact between Jafari and her.  (*Id.* ¶ 80.)  Plaintiff's counsel
denies that they agreed that transfer was an appropriate action.[6]  (Pl.'s 56.1 Statement ¶ 80.)

---

[6]     Plaintiff's counsel does not submit an affidavit supporting this claim, but
(continued...)

Although both positions were administrative in nature, Plaintiff alleges that the position of Ward Clerk has different duties than the Executive Assistant, and that as a Ward Clerk she had no permanent work space. As Ward Clerk, Plaintiff's benefits remained intact and she received the same pay. (Id. ¶ 82.) Plaintiff nevertheless perceived the transfer to be a demotion, and found the work "humiliating." (Urban Dep., at 28-29.) Plaintiff remained in the position for approximately one month, after which time she took a medical leave of absence based on a recommendation from her psychiatrist. (Def.'s 56.1 Statement ¶ 102.) Plaintiff voluntarily terminated her employment with Blossom Hill on November 9, 1997.[7] (Urban Dep., Ex. 3.)

## G.   Procedural History

On August 4, 1997, Plaintiff initially filed this federal action under the Fair Labor Standards Act, seeking overtime payments and alleging that she was retaliated against for demanding her right to overtime pay. On May 13, 1998, this court granted a motion to stay this action pending IDHR's completion of its investigation of Plaintiff's sexual harassment charge, which she had cross filed with the Equal Employment Opportunity Commission

---

[6](...continued)
instead points to a letter he sent to Defendant's counsel on July 11, 1997 wherein he states, "Please be assured that Ms. Urban has absolutely no intention of dropping any of her charges . . . based upon a transfer. As an alternative, I suggest a negotiated separation agreement whereby Ms. Urban releases all of her claims in return for a substantial severance package." (Pl.'s 56.1 Statement ¶ 80, Ex. A.)

[7]     The parties dispute whether Plaintiff's leave was proper and whether she was unable to work. As this dispute goes to the issue of damages, and is not relevant for purposes of this motion for summary judgment, the court need not detail these facts here.

("EEOC"). IDHR dismissed Plaintiff's charge for a lack of evidence. (Urban Dep., Ex. 40, August 26, 1998 Notice of Dismissal.) Upon receiving a right-to-sue letter from the EEOC on September 24, 1998, Plaintiff amended her complaint to add charges of sexual harassment and sex discrimination against Blossom Hill. Plaintiff added claims against Jafari individually for intentional infliction of emotional distress and negligent infliction of emotional distress. On November 9, 1998, Plaintiff dismissed by stipulation the charges filed under the Fair Labor Standards Act. On January 7, 1999 the court dismissed both the intentional and negligent infliction of emotional distress charges. The court also denied Defendant's motion to dismiss Plaintiff's allegations of sexual harassment prior to March 1997. Defendant now moves for summary judgment on Plaintiff's remaining sexual harassment and sexual discrimination claims.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Flores v. Preferred Tech. Group*, 182 F.3d 512, 514 (7th Cir. 1999). In determining the existence of genuine issues of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Flores*, 182 F.3d at 514. An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Carter v.*

*American Oil Co.*, 139 F.3d 1158, 1161 (7th Cir. 1998).  If the nonmoving party bears the burden of proof on an issue, she must offer sufficient evidence to show the existence of each element of her case and cannot rest on the pleadings alone to defeat a motion for summary judgment.  *See Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 395 (7th Cir. 1999).

Further, the Seventh Circuit has recognized that courts must apply the summary judgment standard with rigor in employment discrimination cases because "motive, intent and credibility are crucial issues."  *Crim v. Board of Educ. of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 540 (7th Cir. 1998).  Nonetheless, noting that employment discrimination cases are not governed by a separate rule of civil procedure, the Seventh Circuit recognizes that summary judgment may be appropriate so long as there is no genuine dispute as to the material facts.  *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).  The point is simply that "courts should be careful in a discrimination case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be."  *Id.* at 1396.

### B.   Scope Of Plaintiff's Discrimination Charge

As an initial matter, the court must determine whether Plaintiff's allegations concerning Jafari's conduct prior to March 1997 are outside the scope of her discrimination charges.  In her IDHR/EEOC charge, Plaintiff alleges that "from and after March 31, 1997," she was subjected to a hostile and intimidating work environment and discriminated against based on her gender.  Defendant argues that these allegations are outside the scope of her charge because Plaintiff never told the IDHR, either through filing her charge or during the

13

investigation, that Jafari subjected her to sexual harassment prior to March 1997. Indeed, Defendant argues that Plaintiff's failure to include her pre-March 1997 claims deprived the IDHR of the opportunity to fully investigate and settle the dispute and deprived Defendant of notice that this particular time period was at issue.

It is axiomatic that a Title VII plaintiff "cannot bring claims in a lawsuit that were not included in the EEOC charge." *See Cheek v. Western & Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994). Nevertheless, an EEOC charge encompasses the claims in a plaintiff's discrimination complaint if those claims are like or reasonably related to the allegations of the charge and can reasonably be expected to grow out of an EEOC investigation of the charge. *See id.* (citations omitted). The first part of the test will be satisfied if the EEOC charge and the complaint describes "the same conduct and implicate the same individuals." *See id.* at 501. In other words, there must be a factual relationship between the allegations in the charge and the claims in the complaint -- the fact that both the charge and the complaint assert sexual discrimination charges is not by itself enough. *See id.* The second part of the test requires the court to speculate about what the EEOC might reasonably discover in the course of an investigation. *See id.* at 500.

Arguing that Plaintiff's allegations of unwanted touching and inappropriate language occurring before March 1997 are outside the scope of her EEOC charge, Defendant relies on three cases: *Vela v. Village of Sauk Village,* 218 F.3d 661 (7th Cir. 2000); *Jayne v. ABF Freight System, Inc.,* No. 98 C 2680, 1999 WL 92920 (N.D. Ill. Feb. 16, 1999), *aff'd,* 202 F.3d 273 (Table in WESTLAW), No. 99 C 1670, 1999 WL 1075159 (7th Cir. Nov. 24, 1999); and

14

*Lindblom v. Challenger Day Program, Ltd.*, 37 F. Supp. 2d 1109 (N.D. Ill. 1999). Each case is distinguishable from this one, however.

In both *Vela* and *Jayne*, the plaintiffs filed charges with the EEOC alleging disparate treatment and, in *Jayne*, retaliation for complaining about failure to accommodate a disability, and then attempted to assert claims of hostile environment sexual harassment in their complaints. In both cases, the court held that the sexual harassment claims were outside the scope of the EEOC charge because there was no factual relationship between the two types of charges. *See, e.g., Vela*, 218 F.3d at 664 (claim of sexual harassment is wholly diverse from claim of disparate treatment); *Jayne*, 1999 WL 1075159 at *2 (plaintiff made no mention of behavior that could be construed as sexually harassing in charge and complaint does not describe same incidents or individuals as those specified in charge).

In *Lindblom*, the plaintiff did include sexual harassment in her EEOC charge, but she limited this charge to one specific instance of sexual harassment taking place outside of the workplace at a non-work sponsored event. Although she claimed in her EEOC charge that this incident involved a co-worker, she never alleged that she was harassed at work. Indeed, when she complained to her supervisor about this incident, she specifically told her supervisor that this co-worker had never sexually harassed her at work. When she filed her complaint, however, the plaintiff asserted that this same co-worker also harassed her at work by staring at her, standing too close to her, and inappropriately touching her. The court held that these allegations were outside the scope of her EEOC charge, reasoning that because these incidents were not factually related to the alleged incident in the EEOC charge, the

15

employer did not have adequate notice of an allegation of hostile work environment and repeated touching on the premises.

Unlike the plaintiffs in *Jayne* and *Vela*, Plaintiff here did allege specific instances of sexual harassment in her EEOC charge, and as such, her charge of discrimination clearly identifies her claim as including sexual harassment. Indeed, in both her charge and her complaint, Plaintiff alleges sexual harassment and sex discrimination implicating the same individual, Jafari. Further, unlike the plaintiff in *Lindblom*, Plaintiff here alleges a series of harassing incidents on Defendant's premises. Plaintiff's EEOC charge makes it clear that she alleges sexual harassment based on incidents that occurred at Blossom Hill and involved Jafari. Plaintiff's charge does not include each instance of harassment that she now alleges. Nevertheless, as *Cheek* instructs us, a plaintiff need not allege in her EEOC charge "each and every fact that combines to form the basis of each claim in the complaint." 31 F.3d at 500. The court concludes that there is a sufficient factual relationship between the allegations in Plaintiff's EEOC charge and her subsequent federal complaint.

Now the court must determine whether the allegations in Plaintiff's complaint could reasonably be expected to have grown out of an EEOC investigation into the charges. Defendant argues that Plaintiff's self-imposed time frame of conduct occurring "from and after March 1997" alone is enough to limit the scope of Plaintiff's lawsuit. The court disagrees. Although Plaintiff did describe a specific time frame in her EEOC charge, the court concludes that her pre-March 1997 allegations would have grown out of an EEOC investigation. In fact, during the course of the IDHR's investigation, both Julie Gralewski

16

and Kathy Miller submitted statements describing incidents between Jafari and Plaintiff that support Plaintiff's claim that he subjected her to sexual harassment prior to March 1997. (IDHR Investigation Report, Urban Dep., Ex. 40, at 5.)  Accordingly, the court concludes that Plaintiff's pre-March 1997 allegations are not outside the scope of her EEOC charge.

## C.     Sexual Harassment

The Supreme Court has recognized two categories of sexual harassment: *quid pro quo* harassment and hostile work environment harassment.  *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 750 (1998) ("Title VII is violated by either explicit or constructive alterations in the terms or conditions of employment[.]").  *Quid pro quo* harassment occurs when tangible employment benefits are conditioned upon one's compliance with a harasser's sexual demands.  *See Brill v. Lante Corp.,* 119 F.3d 1266, 1274 (7th Cir. 1997).  In a claim for hostile work environment, sexually demeaning behavior that is so severe or pervasive as to alter the terms and conditions of employment is a violation of Title VII.  *See Ellerth,* 524 U.S. at 750. Plaintiff alleges that Defendant is liable to her for Jafari's conduct both under the *quid pro quo* theory and the hostile environment theory of sexual harassment.[8]

### 1.     *Quid Pro Quo* Sexual Harassment

*Quid pro quo* harassment occurs when a tangible job consequence is conditioned upon an employee's compliance with a harasser's sexual demands.  *See Brill*, 119 F.3d at 1274.  The Seventh Circuit has recognized a five-part test for establishing a claim for *quid pro quo* sexual

---

[8]     Plaintiff does not appear to allege *quid pro quo* sexual harassment in her complaint, but she argues it here in her brief opposing summary judgment.

harassment: (1) the plaintiff is a member of a protected group, (2) the sexual advances were unwelcome, (3) the harassment was sexually motivated, (4) the employee's reaction to the supervisor's advances affected a tangible aspect of the plaintiff's employment, and (5) an agency relationship between the supervisor and the employer has been established. *See Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996). Accordingly, the *quid pro quo* theory requires proof of a link between the a tangible job consequence and the victim's participation, or refusal to participate, in conduct of a sexual nature. *See id.*

Plaintiff asserts that Jafari threatened Plaintiff twice: (1) once for refusing to submit to his advances and (2) again for failing to re-establish a relationship with him. Specifically, Plaintiff alleges that prior to leaving for Wisconsin, Jafari asked her if "she was going to work the next day" after she declined to meet with him socially. With respect to this threat, Plaintiff never alleges, nor provides any evidence that she suffered any tangible job consequence for not submitting to Jafari's demand. Indeed, Plaintiff remained in the Executive Assistant position after she refused his advances, and even after Jafari understood their relationship to be over. As such, Plaintiff has not shown that she suffered a tangible job consequence for failing to participate in conduct of a sexual nature.

Next, Plaintiff argues that after Jafari returned from Wisconsin, he threatened her with termination within four weeks if her attitude towards him did not improve. She characterizes this threat as a demand to re-establish a sexual relationship with Jafari, a demand which Plaintiff refused. Plaintiff then argues that her transfer from Executive Assistant to Ward Clerk constituted a material change in the conditions of her employment. Specifically,

Plaintiff argues that this transfer constituted an adverse job consequence because in her new position she had diminished responsibilities, was deprived of her office and telephone, and suffered diminished pay because her duties required her to work fewer hours.

For several reasons, this claim fails. First, Plaintiff has not established that Jafari's second alleged threat constitutes a sexual demand or advance. Defendant points to documented concerns about Plaintiff's demeanor at work, and Plaintiff herself conceded that her conduct toward Jafari could be considered "rude." Jafari's documentation of Plaintiff's attitudinal problem is buttressed by her co-workers' complaints that she was uncooperative. Even assuming that Plaintiff established that Jafari's second threat was an attempt to coerce her into re-establishing their intimate relationship, Plaintiff has not shown that she suffered a tangible job consequence for failing to submit to this demand. Plaintiff concedes that the alleged adverse employment action was taken in response to her having pursued sexual harassment charges against Defendant. (Pl.'s 56.1 Statement ¶ 216 ("Plaintiff was transferred because she was accusing Robert Jafari of sexual harassment."); Pl.'s Memo. In Opp'n To Def.'s Mot. For Summ. J., at 15 ("[W]hen Jafari learned that Plaintiff had retained a lawyer in connection with his illegal conduct, her job responsibilities were changed and her office, title and phone taken away.").) While Plaintiff's allegations may support a claim for retaliation, a charge which she does not assert here, they do not establish a link between a tangible job consequence and Jafari's demands. *See, e.g., Heuer v. Weil-McLain*, 203 F.3d 1021, 1022-23 (7th Cir. 2000) (affirming summary judgment in favor of defendant where plaintiff asserted sexual harassment claim but only actionable allegation supported an inference of

retaliation, not discrimination).  Without such a connection, Plaintiff is unable to establish a prima facie case of *quid pro quo* sexual harassment.  Accordingly, the court grants summary judgment in favor of Defendant on Plaintiff's *quid pro quo* claim.

2.    **Hostile Work Environment**[9]

Title VII protects an employee from discrimination in the workplace that "creates a hostile or abusive work environment."  *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986).  In order to trigger Title VII protection, a hostile work environment must be sufficiently severe and pervasive so as to alter the conditions of employment.  *See Gleason* v. *Mesirow Fin., Inc.*, 118 F.3d 1134, 1143 (7th Cir. 1997).  To prevail on a hostile environment claim, the plaintiff must establish that her work environment was both subjectively and objectively hostile.  *See id.*  Such a determination must be made by looking at all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance[.]"  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).  Based on this standard, either a single incident of very severe offensive conduct or repeated incidents of less offensive conduct may be actionable.  *See Smith v. Sheahan*, 189 F.3d 529, 533-34 (7th Cir. 1999).  An employer is vicariously liable for an actionable hostile environment created by a supervisor with authority over the employee.

---

[9]    The court notes that Plaintiff appears to have abandoned her hostile environment claim, offering no argument that the complained of conduct rises to the level of a hostile environment.  Because the claim is apparent from Plaintiff's complaint, however, and because Defendant addresses it, the court addresses it as well.

*See Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998), *cert. denied*, 120 S. Ct. 450

(1999) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998); *Burlington Industries,*

*Inc.* 524 U.S. at 765).

Plaintiff sets forth a variety of acts allegedly committed by Jafari which she asserts

resulted in the creation of a hostile work environment.  Specifically, Plaintiff claims that

Jafari subjected her to unwanted touching, inappropriate comments of a sexual nature,

unfinished threats about her job security, repeated questions about her personal life, repeated

invitations to socialize, and lengthy staring.  Defendant disputes each of these alleged acts,

claiming that either they did not happen as described by Plaintiff, or that they happened

during the course of a personal and consensual relationship between Plaintiff and Jafari, and

therefore are not actionable.  The parties also dispute the length and intensity of Jafari's and

Plaintiff's consensual relationship.

In support of its argument that Jafari's conduct was not objectively offensive,

Defendant cites several cases in which summary judgment was granted in favor of the

defendant on claims involving facts arguably more egregious than those facts alleged here.

*See, e.g., Koelsch v. Beltone Electronics Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) (no hostile work

environment where defendant's president rubbed plaintiff's leg with his foot, grabbed her

buttocks, told her he could not control himself in her presence, and asked her to accompany

him for drinks); *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526, 534-35 (7th Cir.

1993) (no hostile environment where supervisor placed his hand on plaintiff's leg above the

knee several times, rubbed his hand along her upper thigh once, pulled her into a doorway

21

and kissed her for two to three seconds, and lurched at her as if to grab her); *Weiss v. Coca-Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir. 1993) (no hostile work environment where a male co-worker asked plaintiff out on dates, placed his hand on her shoulders several times, attempted to kiss her, called her a dumb blonde and left a sign stating "I love you" on her desk); *Derrico v. Pinkerton's, Inc.,* No. 97 C 5851, 1999 WL 311757, at *4 (N.D. Ill. May 12, 1999) (no hostile environment where conduct consisted of isolated instances of rude and mildly offensive remarks, most of which were not directed at plaintiff, and gestures including grabbing his crotch to make a point to other men).

These cases are distinguishable, however, in that none of them contain the element of an unfinished *quid pro quo* threat or the frequency of unwelcome touching as claimed here. Plaintiff Urban alleges that she was touched on a regular basis from October to mid-November.  In the cases cited by Defendant, none of the plaintiffs were touched more than a few times by their harasser.  The court also finds it significant that here, Plaintiff alleges that Jafari used veiled threats when Plaintiff refused to socialize with him, even though he never followed through on those threats. *See Burlington,* 524 U.S. at 754 (accepting District Court's finding that conduct involving numerous unfulfilled threats was severe or pervasive). Although Plaintiff's remaining allegations of staring and inquiry into her personal life, taken alone, may not rise to the level of a hostile work environment, combined with the unwelcome touching and the unfulfilled *quid pro quo* threat, they may add to the severity and pervasiveness of the conduct.  As such, a reasonable jury could find that Jafari's conduct was severe and pervasive enough to fulfill the objective requirement of hostile work environment

22

sexual harassment.

Defendant also argues that Plaintiff did not subjectively find Jafari's conduct severe or pervasive. In support, Defendant cites two incidents in which Plaintiff engaged in sexually graphic conversations:  (1) telling a female co-worker that her boyfriend was well-endowed with a large penis; and (2) allowing a male co-worker with a "toe fetish" to put her foot in his mouth in front of a group of other co-workers.  The court is not persuaded, as these events are not relevant to whether Plaintiff found Jafari's touching and threats unwelcome.  Indeed, Plaintiff testified that she told Jafari that she did not want him touching her at the time these acts occurred.  (Urban Dep., at 224.)  A reasonable jury could find that Plaintiff subjectively considered Jafari's conduct offensive and unwelcome.

Finally, Blossom Hill may be liable for Jafari's conduct if a jury finds it actionable. *See Burlington*, 524 U.S. at 764 ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee.").  The evidence establishes that Jafari was Plaintiff's direct supervisor:  (1) he hired Plaintiff, (2) he gave her orders and assigned her projects, and (3) he was the superior to take disciplinary action against the Plaintiff.

There are remaining questions of fact about the length of the consensual relationship and the offensive conduct alleged.  Defendant's motion for summary judgment on Plaintiff's hostile environment sexual harassment claim is, therefore, denied..

## D.   Sex Discrimination

Under the *McDonnell Douglas* burden shifting approach, a plaintiff can establish a

23

prima facie case of sex discrimination under Title VII by showing that (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting her employer's legitimate performance expectations; (3) she suffered and adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably.  *See Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 376 (7th Cir. 1998).

Based on the same facts constituting her hostile environment claim, Plaintiff also alleges that she was discriminated against by Jafari while working at Blossom Hill.  Assuming that her job transfer constituted an adverse employment action,[10] Plaintiff must show that Jafari treated men more favorably than Plaintiff or that Jafari conducted himself offensively toward Plaintiff because she was a woman, rather than because of their failed relationship. *See, e.g., Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (affirming grant of summary judgment in favor of defendant where the alleged conduct reflected animosity arising from a failed relationship rather than a belief by harasser that female employees are not entitled to equal treatment with male employees).   Although Plaintiff offers no evidence that similarly situated males were treated more favorably than she, the court will assume for the purpose of this decision that male employees at Blossom Hill were not subjected to the same sort of conduct that is alleged here.  Nevertheless, Plaintiff has not established that she was treated  as alleged by Jafari because she was a woman as opposed to his former lover.

---

[10]     Notably, Plaintiff does not attempt to argue here that she was constructively discharged based on her inability to continue working in a hostile environment.

Plaintiff's reliance on a footnote in *Keppler v. Hinsdale Townshp High School District 86*, 715 F. Supp. 862, 870 n.6 (N.D. Ill. 1989), is misplaced. Like the case here, *Keppler* involved a soured relationship and a subsequent Title VII suit. In that case, however, the plaintiff brought a *quid pro quo* claim, but failed to establish that her alleged harasser suggested that she was jeopardizing her job by refusing to continue a sexual relationship. *See id.* at 869. The court granted summary judgment in favor of the defendant, noting that had the plaintiff presented evidence of the threat of reprisals, only a jury could determine whether "it was her rejection of him or her rejection of sex that motivated his subsequent actions." *See id.* at 870, n.6. Here, the court has already dismissed Plaintiff's *quid pro quo* claim, so the fact that she has presented evidence of the threat of reprisal does not save her discrimination claim. Although these alleged threats may support her hostile environment claim, they do not suggest that Plaintiff was discriminated against by Jafari on the basis of her gender. Accordingly, the court grants summary judgment in favor of Defendant on Plaintiff's sex discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. No. 115-1) is granted in part and denied in part. Defendant's motion to strike (Doc. No. 130-2) and to deem certain facts admitted (Doc. No. 130-1) is denied as moot.

ENTER:

Dated: August 31, 2000

Rebecca R. Pallmeyer
REBECCA R. PALLMEYER
United States District Judge